# In the United States Court of Federal Claims

No. 13-80C
(Filed: December 17, 2015)

| | |
|---|---|
| SUMMIT MULTI-FAMILY HOUSING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Keywords: Subject Matter Jurisdiction; RCFC 12(b)(1); Contracts Disputes Act; 41 U.S.C. § 7102(a)(2); Takings Clause; Bid Protest; Corrective Action |

*Lee P. Reno*, Reno and Cavanaugh, PLLC, Washington, DC, with whom was *Mona M. Lyons*, Law Office of Mona Lyons, Washington, DC, for Plaintiff.

*James W. Poirier*, Trial Attorney, with whom were *Steven J. Gillingham*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

Before the Court in this case are the government's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment, as well as Plaintiff's cross-motion for partial summary judgment. For the reasons set forth below, in light of the Federal Circuit's intervening decision in CMS Contract Mgmt. Servs. v. United States, 745 F.3d 1379 (Fed. Cir. 2014), cert. denied, 135 S. Ct. 1842 (2015), the Court grants the government's motion to dismiss Count I (breach of express contract), Count II (breach of implied contract), and Count III (breach of implied duty of good faith and fair dealing) of Plaintiff's complaint for lack of subject matter jurisdiction. Further, it grants the government's motion to dismiss Count IV of the complaint, alleging an uncompensated taking of property because that claim is not ripe for review. Finally, the Court finds that it lacks jurisdiction to consider Count V of Plaintiff's complaint, which Plaintiff has characterized as a bid protest.

**BACKGROUND**

**I.      Invitation for Submission of Applications and Award to Plaintiff**

The Plaintiff in this case, Summit Multi-Family Housing Corporation ("SMHC"), is an Ohio not-for-profit corporation and a "public housing agency" ("PHA") within the meaning of section 1437a(b)(6) of the United States Housing Act of 1937 ("Housing Act"), 42 U.S.C. §§ 1437–40. 2d Am. Compl. ¶ 3, ECF No. 16. Pursuant to that Act, the Secretary of the Department of Housing and Urban Development ("HUD") is authorized to enter into annual contributions contracts ("ACC") with PHAs. 42 U.S.C. § 1437f(b). An ACC, as defined by HUD regulations, is a "contract between HUD and a PHA under which HUD agrees to provide funding for a program under the 1937 Act, and the PHA agrees to comply with HUD requirements for the program." 24 C.F.R. § 5.403. Pursuant to an ACC, a PHA may in turn enter into Housing Assistance Payment ("HAP") contracts to make rental subsidy payments to owners of existing dwellings who provide housing to eligible low-income tenants. See 42 U.S.C. § 1437f(b)(1).

On February 5, 2011, HUD issued an Invitation for Submission of Applications ("ISA") "for the purpose of receiving applications from [PHAs] to administer the Project Based Section 8 [HAP] Contracts as Performance-Based Contract Administrators (PBCA)." 2d Am. Compl. Ex. B at 3. The ISA explained that HUD would "select one PBCA for each of the fifty United States, the District of Columbia, the United States Virgin Islands, and the Commonwealth of Puerto Rico." Id. It further provided that "[t]he successful applicant for each State . . . will enter into a single Performance-Based Annual Contributions Contract . . . with HUD effective October 1, 2011, to administer HAP Contracts with owners of Section 8 projects in the State." Id. Pursuant to the ISA, applications were required to include six specific sections: Certifications, Capability Statement, Technical Approach, Quality Control Plan, Reasoned Legal Opinion, and Disaster Plan. Id. at 10. Failure to comply with the procedures set forth in the ISA, HUD warned, "may result in the applicant being disqualified from award consideration." Id.

SMHC submitted applications to be the PBCA for New York, New Jersey, and Maryland. In three separate letters dated July 1, 2011, HUD notified SMHC that it had been "selected by the Department to serve as the new Performance Based Contract Administrator (PBCA)" for all three states. 2d Am. Compl. Exs. C–E. The letters stated, however, that SMHC's Disaster Plans were deficient and they directed SMHC to submit corrected Disaster Plans by August 31, 2011. Id. In addition, enclosed with the letters were lists of the HAP Contracts assigned to the incumbent PBCAs. Id. SMHC was instructed to review the lists, determine whether any conflicts of interest existed, and submit conflict of interest certifications describing its proposed resolution of any conflicts found by July 31, 2011. Id.

Further, the letters stated that SMHC, as the new PBCA, was required to "be fully operational and ready to administer the Annual Contributions Contract[s] (ACC) by September 30, 2011." Id. Specifically, the letters explained, "[b]etween July 1, 2011, and September 30, 2011, all of the program and project related files, records, documents, and work in progress specified in the Department's PBCA Transition Guidebook must be

obtained from the incumbent PBCA." Id. HUD's PBCA Transition Guidebook "outline[d] a uniform process to transfer responsibilities between Contract Administrators (CAs) who administer and oversee certain project-based subsidy contracts, under Section 8" of the Housing Act. 2d Am. Compl. Ex. G at 4. It set forth specific transition tasks and due dates for the completion of those tasks over a ninety-day transition period. See id. at 5–6. According to SMHC, it commenced performance of those tasks immediately upon receiving the award letters. 2d Am. Compl. ¶ 55.

Just as SMHC received an award letter dated July 1, 2011, unsuccessful applicants, including the incumbents for New York, New Jersey, and Maryland, received letters dated July 1, 2011, notifying them that they had not been selected. 2d Am. Compl. Ex. F. These letters offered the unsuccessful PHAs an opportunity for a debriefing conference to discuss the weaknesses or deficiencies in their applications. Id. The letters to the incumbents stated that they were "required to close-out [their] current [contracts] and transfer the program and project files, records, and reports . . . to the [successful] PHA during the ninety (90) day period July 1, 2011 to September 30, 2011, as specified in the PBCA Transition Guidebook." Id.

## II.    Bid Protests and HUD's Corrective Action

On July 11, 2011, a number of the unsuccessful applicants filed bid protests with the Government Accountability Office ("GAO"), contesting the selection of SMHC as the PBCA for New York, New Jersey, and Maryland, as well as the selections for forty-two other states. See 2d Am. Compl. Exs. I–L. The protestors contended that HUD's evaluation of the applications did not conform with the ISA or procurement law. See Def.'s Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def.'s Mot.") App. at 92–111, ECF No. 17; see also CMS Contract Mgmt. Servs. v. United States (CMS I), 110 Fed. Cl. 537, 548 (2013) (observing that "the protests generally alleged that the PBACCs were procurement contracts and not properly awarded in accordance with federal procurement law, that out-of-state PHAs were not legally qualified to administer the Section 8 program within a given state, and that HUD's evaluation of the applications was flawed"), rev'd sub nom. CMS Contract Mgmt. Servs. v. Massachusetts Hous. Fin. Agency, 745 F.3d 1379 (Fed. Cir. 2014), cert. denied, 135 S. Ct. 1842 (2015). SMHC claims that it learned of these protests "through informal means" in late July 2011, and it intervened in the protests shortly thereafter. Pl.'s Mem. in Opp'n to the Def.'s Mot. to Dismiss and in Supp. of Pl.'s Cross-Mot. for Partial Summ. J. ("Pl.'s Mem.") App. at 13–14, ECF No. 21; 2d Am. Compl. ¶ 60.

Meanwhile, SMHC continued to conduct its transition activities. Pl.'s Mem. App. at 13–14. It did so, according to SMHC, based on HUD's advice. For example, SMHC alleges, HUD's Contract Administrator Oversight Monitor stated during a conference call that HUD intended to carry on uninterrupted with the newly awarded PBCA contracts in spite of the pending protests. See id. at 14, 1001.

On July 26, 2011, the president of SMHC sent an email to Deborah Lear, then the Director of HUD's Office of Housing Assistance Contract Administration Oversight, "requesting confirmation that [SMHC] should be continuing in accordance with the

3

Transition Guide for an October 1 start date" and reminding her that SMHC was "expending funds and human resources as [it] move[d] forward." Def.'s Mot. App. at 125. In Ms. Lear's response, dated July 27, 2011, she advised that "[d]ue to the GAO protests, we are not in a position to direct any transition activity from incumbents to new PBCA[s] for the states under protest." Id. She also stated that "any decision regarding moving forward on any transition activity from [the] incumbent[s] to [SMHC] is a business decision left up to your organization." Id. SMHC contends that it decided to move ahead with the transition "to protect its contract interests, and to avoid defaulting for failure to meet the Transition Guidebook deadlines." Pl.'s Mem. at 24.

On July 21, 2011, HUD moved to dismiss the GAO protests, arguing foremost that GAO lacked jurisdiction under the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551(1), 3552(a), because the ACCs were cooperative agreements, not procurement contracts. Pl.'s Mem. App. at 1006. Shortly thereafter, however, HUD notified GAO that it was going to withdraw the awards for the contracts that had been protested and "evaluate and revise its competitive award process for the selection of [PBCAs]." Def.'s Mot. App. at 126.

HUD notified SMHC and other PHAs of its decision to take corrective action and re-compete the contracts in a letter dated August 11, 2011. Pl.'s Mem. App. 1089–90. About one month later, HUD sent SMHC another letter, dated September 8, 2011, stating that "the Department is rescinding its July 1, 2011, notice of a change of Performance Based Contract Administrator (PBCA) in your state." Id. at 1092.

According to the Declaration of Janet M. Golrick, who was then the Acting Deputy Assistant Secretary for Multifamily Housing Programs within HUD's Office of Housing Division, "HUD's primary reason for taking corrective action related to a contention by the protestors that HUD's evaluation was flawed because it did not specifically inform applicants how HUD would evaluate the proposed fee." Def.'s Mot. App. at 206; see also id. at 207–08. She further asserts that "HUD's decision to take corrective action was solely a result of the allegations raised in the various bid protests and reflected a determination by HUD that there were portions of the ISA that needed to be improved to ensure the fairness of the competition and to comply with applicable law." Id. at 208.

III.    **Re-Competition, Second Round of Bid Protests, and the Federal Circuit's Decision in CMS Contract Management Services v. United States**

On March 9, 2012, HUD attempted to re-compete the PBACCs in the contested states by issuing a Notice of Funding Availability ("NOFA"). Id. at 139. The NOFA clarified certain evaluation criteria that had been challenged during the GAO protests. See id. at 145. It also explicitly noted for the first time that HUD intended to award cooperative agreements, not procurement contracts. Id. Contesting HUD's characterization of the PBACCs as cooperative agreements, seven PHAs subsequently filed pre-award bid protests with GAO. See id. at 178–88; Assisted Housing Servs. Corp., B-406738, 2012 WL 3341727 (Comp. Gen. Aug. 15, 2012).

On August 15, 2012, GAO sustained the protests, concluding that HUD was "required to use a procurement instrument that results in a contract to obtain the provision of contract administration services by PHAs for the Project-Based Section 8 HAP contracts." Def.'s Mot. App. at 186. It recommended "that HUD cancel the NOFA, and solicit the contract administration services . . . through a procurement instrument." Id. On December 3, 2012, however, HUD issued a notice indicating that it did not intend to follow the GAO's recommendation. See CMS Contract Mgmt. Servs. v. United States (CMS II), 745 F.3d 1379, 1384 (Fed. Cir. 2014), cert. denied, 135 S. Ct. 1842 (2015).

The PHAs that had filed protests at GAO then filed pre-award bid protests in the Court of Federal Claims, again asserting that the ACCs should be classified as procurement contracts and that HUD's NOFA violated CICA and the Federal Acquisition Regulations ("FAR"). CMS I, 110 Fed. Cl. at 541. The Court of Federal Claims granted judgment on the administrative record for the government, finding that HUD "properly classified [the PBACCs] as cooperative agreements." Id.

The PHAs appealed the Court of Federal Claims' decision and, on March 25, 2014, the Federal Circuit reversed. CMS II, 745 F.3d at 1386. According to the Federal Circuit, the PBACCs constituted procurement contracts and were subject to the statutes and regulations applicable thereto. Id. The government petitioned for a writ of certiorari from the United States Supreme Court; but on April 20, 2015, the Supreme Court denied certiorari, allowing the Federal Circuit's decision to stand. See 135 S. Ct. 1842 (2015).

## IV.    SMHC's Action in This Court

In the meantime, SMHC filed the present complaint in this court on January 30, 2013, and filed amended complaints on April 22, 2013, and May 13, 2013. ECF Nos. 1, 13, 16. In its complaints, SMHC claims that it entered into three PBCA contracts with HUD on July 1, 2011. 2d Am. Compl. ¶ 54. It further contends that pursuant to those contracts, it was required to undertake certain transition tasks that HUD had identified in its Transition Guidebook during the first three months of contract performance. Id. It claims that it immediately commenced performance under the contracts by beginning to perform those tasks. Id. ¶ 55. And finally, it claims that HUD breached the contracts on September 8, 2011, when it officially notified SMHC of their rescission. Id. ¶¶ 69–70.

SMHC's second amended complaint contains five counts: breach of express contract (the three PBCA contracts); breach of implied contract consisting of the same terms as the alleged express contracts; breach of implied duty of good faith and fair dealing with respect to the three PBCA contracts; uncompensated taking of Plaintiff's property interest in the three PBCA contracts in violation of the Fifth Amendment; and a bid protest claim (which was not included in SMHC's earlier complaints) asserting that HUD acted arbitrarily, capriciously, and contrary to law in awarding the PBCA contracts to SMHC and then rescinding the contracts on September 8, 2011. Id. ¶¶ 72–100.[1]

---

[1] In Counts I through IV, SMHC seeks $4,938,545.46 in damages—the amount, according to SMHC, that it earned in fees under the contracts for the work it performed

On June 17, 2013, the government filed a motion to dismiss the complaint in its entirety for failure to state a claim or, in the alternative, for summary judgment. ECF No. 17. The government's primary argument in that motion was that no contract existed between HUD and SMHC because the parties never executed a written ACC. Def.'s Mot. at 12–16. It further argued that the doctrine of laches barred SMHC's bid protest claim and that, in any event, it was entitled to judgment on the administrative record with respect to that claim. Id. at 31–32. SMHC filed a cross-motion for partial summary judgment on August 19, 2013. ECF No. 21. The government filed a response and reply on November 1, 2013, ECF No. 29; and SMHC filed a reply on December 19, 2013, ECF No. 34.

After the Federal Circuit's March 25, 2014 decision in CMS II, the government filed a notice of supplemental authority in which it contended that—in light of that decision—this Court should dismiss Counts I–IV of the complaint for lack of jurisdiction pursuant to Rules of the Court of Federal Claims ("RCFC") 12(b)(1). Def.'s Notice of Suppl. Authority at 2–3, ECF No. 35. This Court then stayed the case pending the Supreme Court's disposition of any petition for certiorari filed by the government. Order Staying Case, ECF No. 42. As described above, the government filed such a petition, which the Supreme Court denied on April 20, 2015. Pursuant to this Court's Order, the parties then filed supplemental briefs addressing the impact of the Federal Circuit's decision in CMS II on this Court's jurisdiction over SMHC's complaint. ECF Nos. 50–52.

For the reasons set forth below, the Court concludes that, pursuant to the ruling in CMS II, SMHC's breach of contract claims are subject to the Contract Disputes Act ("CDA"), 41 U.S.C. § 7102(a)(2). It further concludes that SMHC did not submit a valid, certified claim to the contracting officer and receive the contracting officer's final decision on that claim, as is required to invoke this Court's jurisdiction under that Act. See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1329 (Fed. Cir. 2010). Therefore, Counts I–III of SMHC's second amended complaint must be dismissed for lack of jurisdiction.

In addition, the Court finds that because SMHC did not exhaust the required administrative procedure for breach of contract, its takings claim is not ripe for review. Therefore, Count IV of the complaint must similarly be dismissed.

---

prior to HUD's rescission; or, in the alternative, $2,304,631.02—the amount, according to SMHC, it incurred in costs and expenses, plus its lost profits. 2d Am. Compl. ¶¶ 78, 81, 89, 93. In Count V, SMHC seeks $690,106.26—the amount it expended in preparing its bid. Id. ¶ 100.

Finally, the Court concludes that SMHC lacks standing to assert the claims set forth in Count V of its amended complaint, which it characterizes as a "bid protest." Accordingly, Count V is dismissed for lack of jurisdiction.

## DISCUSSION

### I.      Motion to Dismiss Under RCFC 12(b)(1)

Whether this Court has jurisdiction to decide a case is a threshold matter, and, if no jurisdiction exists, the Court must order dismissal without proceeding further. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998)). In deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all undisputed facts in the plaintiff's complaint and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). If subject matter jurisdiction is challenged, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The party invoking a court's jurisdiction bears the burden of establishing it, and must ultimately do so by a preponderance of the evidence. Id.; Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

### II.     Jurisdiction Over Counts I–III—Contract Claims

#### A.      Tucker Act

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012). Subsection (a)(2) of the section 1491 further grants the Court of Federal Claims "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41"—that is, the CDA—"including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act."

#### B.      The Contract Disputes Act

The CDA covers any claims based upon "any express or implied contract . . . made by an executive agency for—(1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a). Under the CDA, "procurement" means "the acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government." New Era Constr. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (quotation and emphasis omitted).

The CDA sets forth its own jurisdictional requirements. See M. Maropakis Carpentry, 609 F.3d at 1327–28. In particular, it states that a contractor may only bring an action de novo in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b)(3). Thus, the Federal Circuit has held that for the Court of Federal Claims to possess jurisdiction, the contractor must have first submitted a valid claim to its contracting officer and received the contracting officer's final decision on that claim. M. Maropakis Carpentry, 609 F.3d at 1327–28. Further, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution; the Contract Disputes Act was not designed to serve as an alternative administrative remedy, available at the contractor's option." Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995).

The definition of "claim" for purposes of the CDA derives from the FAR, which implements the CDA. See M. Maropakis Carpentry, 609 F.3d at 1327–28. FAR 2.101 provides, in pertinent part that "claim" means "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." Id.; see also FAR 52.233-1 (setting forth, in a standard contract clause, the same definition of "claim" as in FAR 2.101). The Federal Circuit, interpreting this provision, has held that a valid CDA claim consists of three components: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." Northrop Grumman Computing Sys., Inc. v. United States, 709 F.3d 1107, 1112 (Fed. Cir. 2013) (citing Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575–76 (Fed. Cir. 1995)). The Federal Circuit has further explained that "[w]hile a valid claim under the CDA must contain 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim,' the claim need not take any particular form or use any particular wording." Id. (quoting Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987)). "All that is required," the Federal Circuit has observed, "is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Id. (quoting Contract Cleaning Maint., Inc., 811 F.2d at 592).

For claims seeking more than $100,000, FAR 2.101 additionally incorporates within the definition of "claim" the CDA's certification requirement. 41 U.S.C. § 7103(b)(1). That requirement provides as follows:

> For claims of more than $100,000 made by a contractor, the contractor shall certify that--
> (A)   the claim is made in good faith;
> (B)   the supporting data are accurate and complete to the best of the contractor's knowledge and belief;
> (C)   the amount requested accurately reflects the contract adjustment for which the contractor believes the Federal Government is liable; and
> (D)   the certifier is authorized to certify the claim on behalf of the contractor.

Id.; see also FAR 33.207(c) (providing specific certification language, which includes the language of § 7103(b)(1) nearly verbatim).

## C.      The Court Lacks Jurisdiction Over Plaintiff's Contract Claims

In CMS II, the government argued that HUD's PBACCs are cooperative agreements and not procurement contracts and that their principal purpose was to distribute grant funds. 745 F.3d at 1385–86. The Federal Circuit, however, rejected that argument, concluding that "the primary purpose of the PBACCs is to procure the services of the PBCAs to support HUD's staff and provide assistance to HUD with the oversight and monitoring of Section 8 housing assistance." Id. at 1385. As both SMHC and the government agree, the necessary conclusion to be drawn from the Federal Circuit's decision is that PBACCs are procurement contracts subject to the CDA. See Def.'s Resp. to Order at 3, ECF No. 50; Pl.'s Resp. to Order at 2, ECF No. 51.

SMHC argues nonetheless that its breach of contract claims are not subject to the CDA's exhaustion requirement, contending that the July 1, 2011 contracts it entered with HUD were not themselves PBACCs. See Pl.'s Resp. to Order at 2. "At most," SMHC contends, they were "agreements to later enter into what should have been procurement contracts but were not regarded as such by either party at the time." Id.

This contention is unavailing for several reasons. First, the contention is inconsistent with the allegations in SMHC's complaints. As described above, SMHC's complaints clearly characterize the breach claims as involving violations of the PBACCs themselves, and not violations of some other preliminary agreement to enter PBACCs.

Moreover, and in any event, SMHC acknowledges that "[t]he July 1, 2011 contracts obligated SMHC to be 'fully operational and ready to administer the [PBACCs] by September 30, 2011' and to obtain 'all of the program and project related files, records, documents, and work in progress specified in the Department's PBCA Transition Guidebook' from the incumbent Contract Administrator between July 1, 2011 and September 30, 2011." Id. (quoting HUD's selection letters). Thus, even if the alleged breaches were of an agreement to subsequently enter procurement contracts, that agreement in and of itself allegedly obligated SMHC to provide transitional services to HUD and would therefore be considered a procurement contract in its own right.

SMHC's argument that—assuming that the CDA applies—it complied with that Act's administrative exhaustion requirement is similarly unpersuasive. It observes that "[o]n December 9, 2011, only a few months after HUD rescinded the July 1, 2011 contracts, SMHC submitted a letter (the written claim) to then-HUD Secretary Shaun Donovan (the contracting officer) requesting reimbursement 'for all expenses incurred' pursuant to the July 1, 2011 contracts and 'payment of the Administrative Fees to which [SMHC] would have been entitled . . . had HUD not unilaterally repudiated and breached its contract[s] with SMHC.'" Id. at 5–6 (quoting Pl.'s Resp. to Order Ex. 1 at 1). SMHC notes that "HUD did not respond to the December 9, 2011 letter within the 60 days mandated by the CDA" or to a subsequent demand letter sent by its counsel to then-Secretary Donovan on October 12, 2012. Id. at 6.

Assuming (without deciding) that then-Secretary Donovan could be considered a contracting officer for purposes of the CDA, the two letters nonetheless do not meet the CDA's exhaustion requirements. As explained above, a valid CDA claim consists of three components: "(1) a written demand, (2) seeking, as a matter of right, (3) the payment of money in a sum certain." Northrop Grumman Computing, 709 F.3d at 1112 (citing Reflectone, Inc., 60 F.3d at 1575–76). In this case, neither letter constitutes a claim because neither identifies a "sum certain" that SMHC was seeking as a matter of right.

Further, neither letter satisfies the certification requirement for claims exceeding $100,000 set forth in section 7103(b) of the CDA and incorporated into FAR 2.101. As described above, a certification must affirmatively state that the claim is made in good faith; that the supporting data are accurate and complete to the best of the contractor's knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the federal government is liable; and that the certifier is authorized to certify the claim on behalf of the contractor. 41 U.S.C. § 7103(b)(1). None of these requirements are met in the two letters SMHC sent to then-Secretary Donovan.[2]

In short, this Court lacks jurisdiction over SMHC's contract claims (contained in Counts I–III of its complaint) because SMHC failed to exhaust its administrative remedies under the CDA by failing to file a valid, certified claim with HUD. Accordingly, Counts I through III of the complaint must be dismissed.

## III.    Count IV—Takings

In Count IV of its complaint, SMHC alleges that the PBACC contracts it entered with HUD created property interests protected by the Fifth Amendment's Takings Clause. 2d Am. Compl. ¶ 91. Therefore, SMHC claims, when HUD unilaterally rescinded the contracts, it was required to compensate SMHC for its "costs, expenses, earned Administrative Fees, and/or earned profits" lost as a result of the government's taking of its contract property. Id. ¶ 92.

It is well established that claims for damages under the Takings Clause of the Fifth Amendment are within this Court's Tucker Act jurisdiction. E.g., Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1309 (Fed. Cir. 2008). The government argues, however, that because SMHC failed to exhaust the administrative procedure prescribed by the CDA for pursuing its breach of contract claims, its takings claim is not ripe and should be dismissed on that basis.

---

[2] These requirements are more than just a formality. Indeed, the Federal Circuit has held that "the statutory mandate that all claims over [a specified amount] must be certified is one of the most significant provisions of the CDA." Fidelity Const. Co. v. United States, 700 F.2d 1379, 1384 (Fed. Cir. 1983).

The Court agrees with the government. The purpose of the ripeness doctrine is to prevent the courts, "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148–49 (1967), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). "In assessing ripeness, there are two basic factors: '(1) the fitness of the issues for judicial decision[;] and (2) the hardship to the parties of withholding court consideration.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383–84 (Fed. Cir. 2012) (alteration in original) (quoting Abbott Labs., 387 U.S. at 149). "When a party challenges government action, the first factor becomes a question of whether the challenged conduct constitutes a final agency action." Id. at 1384.

In this case, the takings claim is not fit for review because it is inextricably intertwined with SMHC's contract claims. There has been no final agency decision with respect to the action that SMHC challenges as a taking—the rescission of its alleged contracts with HUD—because the claims have not been presented to the contracting officer as the CDA requires.

In short, permitting SMHC to bring the takings claim to Court without first filing a contract claim with the contracting officer would allow it to circumvent the administrative process that Congress established for the resolution of federal procurement contract disputes. For that reason, the Court concludes that the takings claim should be dismissed as unripe. See McGuire v. United States, 707 F.3d 1351, 1359–60 (Fed. Cir. 2013) ("There is no dispute that 'when an agency provides procedures for obtaining a final decision, a takings claim is unlikely to be ripe until the property owner complies with those procedures.'" (quoting Morris v. United States, 392 F.3d 1372, 1376 (Fed. Cir. 2004))); Medina Const., Ltd. v. United States, 43 Fed. Cl. 537, 560 (1999) (takings claim involving rights under contract not ripe for review where plaintiff failed to present claims to contracting officer as required by the CDA). Accordingly, the Court lacks jurisdiction over the claims asserted in Count IV of SMHC's complaint.

## IV.    Count V—Bid Protest

The Court of Federal Claims' bid protest jurisdiction is defined by 28 U.S.C. § 1491(b)(1). That provision grants the Court jurisdiction to "render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." As specified, only an "interested party" has standing to invoke the Court's bid protest jurisdiction under 28 U.S.C. § 1491(b)(1). CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). An "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract." CGI Fed., 779 F.3d at 1348 (quoting Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 258 F.3d 1294, 1299 (Fed. Cir. 2001)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In a post-award bid protest, a

disappointed bidder may establish its "direct economic interest" by showing that it had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005).

In this case, at least up until oral argument was held, the government did not challenge SMHC's standing to pursue its bid protest.  See Def.'s Resp. to Order at 2 ("We do not challenge the jurisdiction of the Court to consider Summit's claim for bid preparation costs."). Despite this concession, of course, the Court has an independent duty to "satisfy itself . . . of its own jurisdiction." Textile Prod's, Inc. v. Mead Corp., 134 F.3d 1481, 1485–86 (Fed. Cir. 1998) (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986)); see also Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342–43 (Fed. Cir. 2001).

Notwithstanding the government's prior concession, the Court concludes that it lacks jurisdiction over the bid protest claim because SMHC lacks standing to pursue it. To be sure, SMHC would have standing to challenge the corrective action that HUD took, which resulted in the withdrawal of the contract award, the subsequent issuance of the NOFA, and a re-competition. See, e.g., Sys. Application & Techs., Inc., 691 F.3d at 1382–83 (awardee has standing to challenge corrective action that results in rescission of its award and re-competition of contract). But SMHC does not claim that HUD's decision to take corrective action was arbitrary, capricious, or contrary to law. In fact, SMHC's allegations suggest precisely the opposite conclusion.

Thus, SMHC's complaint cites Ms. Golrick's statements that the process HUD used during the initial procurement "needed to be improved to ensure the fairness of the competition and to comply with applicable law" and that HUD had failed to specifically disclose "how HUD would evaluate the proposed fee [under the ISA]"). 2d Am. Compl. ¶ 96 (alteration in original). It also cites and quotes statements made by the government in its pleadings before the trial court in CMS I to the effect that HUD used ambiguous evaluation criteria and that its ISA and selection process created confusion and was inconsistent with HUD standards. Id. Each of these explanations, SMHC alleges, was "an admission by [HUD] that it failed to comply with the statutes, regulations, and other HUD standards that govern HUD in administering 'procurements' for the award of PBCA contracts." Id.; see also Pl.'s Mem. at 58–59.

Further, at oral argument on the cross motions, which was held on December 9, 2015, counsel for SMHC confirmed that it was not alleging that HUD acted unlawfully or unreasonably when it decided to take corrective action. Rather, counsel contended that the gravamen of Count V of the complaint was that the initial competition was marked by violations of law and/or arbitrary action and that SMHC suffered injury as a result of these alleged violations because they resulted in the cancellation of its contract. Oral Arg. at 20:30–21:53.

Of course, the mere fact that HUD decided to take corrective action is not sufficient to show that its initial award to SMHC was arbitrary, capricious, or contrary to law. ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 72 & n.24

(2001) (observing that "the government is not obliged to admit an error as a precondition to proposing corrective action," nor is it "necessary for an agency to conclude that the protest is certain to be sustained before it may take corrective action; where the agency has reasonable concern that there were errors in the procurement, even if the protest could be denied" (quotation omitted)), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); accord Data Monitor Sys., Inc. v. United States, 74 Fed. Cl. 66, 74 (2006). But more to the point, to the extent that the initial procurement was marred by arbitrary, capricious, or illegal decision-making by HUD, SMHC lacks standing to challenge such decision-making because SMHC was not injured by those alleged improprieties. See Info. Tech., 316 F.3d at 1319 (observing that "the question of prejudice goes directly to the question of standing" and that "prejudice (or injury) is a necessary element of standing" (quotation and citations omitted)). To the contrary, at the end of the allegedly flawed process, SMHC was the awardee. In fact, SMHC originally intervened on the side of HUD to defend the original award when it was challenged before the GAO.

It was not the award, but rather it was the corrective action (whose lawfulness and reasonableness SMHC does not challenge) that resulted in injury to SMHC. And while there are many cases in which a successful offeror challenges the reasonableness of an agency's corrective action, SMHC has not identified a single case in which a successful offeror whose award was rescinded as a result of voluntary corrective action mounted a bid protest that instead challenged the very process that had resulted in its contract award.[3]

In short, SMHC lacks standing to mount the claim it articulates in Count V of its complaint. Accordingly, that Count must be dismissed.[4]

## CONCLUSION

On the basis of the foregoing, the government's motion to dismiss the complaint is **GRANTED** and Plaintiff's complaint is **DISMISSED** without prejudice. The parties'

---

[3] It also bears noting that even if SMHC somehow had standing to challenge the process that resulted in its contract award, any challenge to that process would in any event be moot. See Coastal Envtl. Grp., Inc. v. United States, 114 Fed. Cl. 124, 131 (2013) ("[T]he Court of Federal Claims has consistently found that the cancellation of a procurement renders a protest of that procurement moot."); CCL Serv. Corp. v. United States, 43 Fed. Cl. 680, 689–90 (1999) (concluding that the court could not award bid preparation costs where protestor did not challenge corrective action which resulted in cancelation of the solicitation and decision to re-solicit the procurement, because the corrective action rendered moot the unsuccessful offeror's challenge to the original evaluation and award).

[4] In light of its conclusion that it lacks jurisdiction over Count V of the complaint, the Court does not address the government's argument that the doctrine of laches bars SMHC's pursuit of its bid protest claim.

cross-motions for summary judgment are therefore **DENIED** as moot. Each side shall bear its own costs.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 /s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge